IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LISA FRANKLIN                                          CV. 07-1667-PK

          Plaintiff,                              FINDINGS AND
                                                        RECOMMENDATION

v.

NIKE, INC., an Oregon corporation,

          Defendant.
_____

PAPAK, Magistrate Judge:

       Plaintiff Lisa Franklin brings this action alleging Title VII claims for race discrimination,

gender discrimination and retaliation against her former employer, Nike, Inc.  This court has

jurisdiction under 28 U.S.C. § 1331.  Defendant's Motion for Summary Judgment (#40) is now

before the court.  Defendant's motion should be granted for the reasons set forth below.

## BACKGROUND

       Franklin is an African-American woman.  She commenced her employment with Nike in

December 2000, as a customer service representative in Memphis, Tennessee.  (Dussault Decl.,

#45, Ex. 1 at 3, 5.)  Nike terminated Franklin's employment on July 11, 2007.  (Reynolds Decl.,

FINDINGS AND RECOMMENDATION – PAGE 1

#44 at 1.)

## I.    Franklin's Employment With Nike in Memphis

Approximately eight months into her employment with Nike in Memphis, Franklin received a "record of coaching" from her supervisor.  (Dussault Decl. Ex. 1 at 68.)  A record of coaching is the lowest level of corrective action that Nike supervisors can use to address employee performance problems.  (Dussault Decl. Ex. 2 at 32.)  Franklin's supervisor noted that, over a two-month period, Franklin was late to work four times, and had three unplanned absences.  (Dussault Decl. Ex. 1, at 68.)  Franklin does not dispute the accuracy of the record of coaching.  *Id.* at 11.

Franklin's performance improved for the remainder of her time in Memphis.  Franklin's 2001 performance evaluation indicated that she met her accountability goals, that she met standards for most of the job's core competencies and that she should focus on maintaining good dependability.  (Franklin Decl., #57, Ex. 1.)  Franklin's mid-year evaluation in 2002 indicated that her manager reviewed her "punch detail," an attendance record, and her final evaluation rated her as an achiever, the second-highest rating available.  (Dussault Decl. Ex. 1 at 12, Franklin Decl. Ex. 2.)

## II.    Franklin's Employment with Nike in Portland

In June 2003, Franklin applied for and obtained a position as a senior account services representative in the team sports equipment division at Nike headquarters in Portland.  (Dussault Decl. Ex. 1 at 6; Franklin Decl. at 2.)  Franklin worked under several different supervisors during her time with Nike in Portland.  She attributes the basis of her current claims to the actions of two of those supervisors, Elana Latch and Pete Simmons.  (Dussault Decl., Ex. 1 at 42, Pederson Decl., #60, Ex. 1. at 22.)  Franklin testified that Simmons was the only individual at Nike who

FINDINGS AND RECOMMENDATION – PAGE 2

discriminated against her because of her gender but that Simmons and Latch had both engaged in racial discrimination.

### A.    Employment Record With Supervisor Latch

Elena Latch served as Franklin's first supervisor in Portland.  (Franklin Decl. at 2.)  In December 2003, Latch gave Franklin a written reminder regarding problems with attendance.  (Dussault Decl. Ex. 1 at 73.)  A written reminder is the second level of corrective action that a Nike manager may use to address employee performance problems.  (Dussault Decl. Ex. 2 at 16.)  The reminder indicates that Franklin acknowledged that her response times and ability to manage her workload did not meet expectations.  (Dussault Decl. Ex. 1 at 73.)  Franklin, however, testified that she thought the reminder was unfair because it arose out of a misunderstanding with a sales representative who thought she was not at her desk when she was, in fact, there but on another phone line.  (Dussault Decl. Ex. 1 at 13.)  The reminder further indicated that, going forward, Franklin would be on time.  *Id.* at 73.

Franklin later filed a written response to the reminder.  *Id.* at 79-80.  Franklin stated that she would meet with her manager to ensure she met expectations, but felt that she was asked to do more than her co-workers.  *Id.* at 80.  The response did not make any mention of discrimination.  *Id.*  In addition, Franklin admitted that she did not know whether Latch treated non-African-American employees in the same manner.  (Pl.'s Resp. to Def.'s Stmt. Material Facts, #56, at 2.)

### B.    Employment Record With Supervisor Simmons

In March 2004, Franklin moved to the soccer division, where Pete Simmons served as her supervisor.  (Franklin Decl. Ex. 3 at 3.)  In June 2004, Simmons gave Franklin a positive evaluation, noting that she successfully transitioned into the soccer division.  *Id.*

FINDINGS AND RECOMMENDATION – PAGE 3

Franklin took unplanned medical leave after the birth of her son and returned in March 2005.  (Franklin Decl. at 2; Dussault Decl. Ex. 1 at 33.)  According to Franklin's declaration, after her return, she had a conversation with Simmons regarding a workplace display she found offensive.  (Franklin Decl. at 2.)  During her deposition, however, she stated that the conversation occurred after she returned "from vacation or whatever" but she could not specifically remember when it took place.  (Dussault Decl. Ex. 1 at 22.)

The display at issue included several stuffed birds and a single black buzzard hanging from a noose.  (Franklin Decl. at 2.)  Franklin felt the display had racial overtones and discussed the matter with Simmons.  (Dussault Decl. at Ex. 1 at 22.)  Simmons told her it was something they were doing to motivate the team and that she was too sensitive and not a team player.  *Id.* Ultimately, Simmons removed the display.  (Franklin Decl. at 2.)

Simmons completed an annual employment review for Franklin in July 2005.  The review noted that Franklin was successful in handling calls, increasing her product knowledge and developing training materials.  (Franklin Decl. Ex. 4 at 3; Dussault Decl. Ex. 1 at 91.)  The review, however, also stated that Franklin must arrive to work on time every day for the remainder of the business year.  *Id.*  Simmons' review also indicated that he gave Franklin "phones only" duty after she returned to work because she was still taking care of her newborn son and that she was "doing her job and just that."  (Franklin Decl. Ex. 5.)  Simmons rated Franklin as "inconsistent," Nike's second-lowest rating for employee performance.  (Franklin Decl. Ex. 4 at 3; Dussault Decl. Ex. 1 at 91.)

In August 2005, Franklin contacted human resources to discuss her employment review. (Dussault Decl. Ex. 1 at 19, 94-95.)  At human resources' request, she sent an email summarizing her concerns.  *Id.* at 93.  This was her first interaction with human resources regarding her

FINDINGS AND RECOMMENDATION – PAGE 4

concerns. *Id.* at 19. Franklin indicated that she thought the rating was unfair because she told Simmons the phone lines were slow and offered to take on other projects. *Id.* Franklin did not take issue with Simmons' comment concerning timeliness, nor did she mention discrimination. *Id.*

In November 2005, Simmons gave Franklin a record of coaching for 1) working 14.5 hours of overtime without requesting permission; 2) submitting time cards that reported Franklin worked two days when she was actually out sick on those days; 3) arriving to work one hour late; and 4) failing to appear for work after calling to report that she would be in late. (Dussault Decl. Ex. 1 at 96.) Although Franklin testified that she had requested permission for the overtime and that the time card matter was an oversight she later corrected, she admitted that she failed to appear for work as Simmons described. *Id.* at 23-24.

On May 26, 2006, Simmons distributed an email to the entire soccer customer service team regarding attendance issues. *Id.* at 98. The email indicated that employees had to call Simmons if they were sick or coming into work late. *Id.* Later that day, Franklin asked a co-worker how to handle making up missed time and the co-worker told her to make it up within the pay period and to let Simmons know, just as another co-worker had done. (Franklin Decl. Ex. 7.) That co-worker had earlier informed the group and Simmons that he came in early and planned to take an hour to run errands at lunch. *Id.* Franklin testified that she was the only person that Simmons expected to follow the policy and that three employees who sat near her did not follow it. (Dussault Decl. Ex. 1 at 25.) She also testified, however, that most of the time she did not make up the time when she came in late. *Id.* at 23.

In June 2006, Franklin returned from lunch one hour late without informing Simmons. *Id.* at 25, 99. Instead, she "called in to notify the team of the tardy" and that she would use paid

FINDINGS AND RECOMMENDATION – PAGE 5

time off for the lost time.  *Id.* at 99.  Simmons sent an email to Franklin confirming that they had discussed the matter and that any other performance issue would automatically result in her termination.  *Id.* at 99.  Franklin responded that she thought a phone call to co-workers was acceptable and that it would not happen again.  *Id.*

Franklin's annual employment review in July 2006 reflected her problems with tardiness and attendance.  Simmons indicated that he wanted to see Franklin take less unplanned paid time off or discuss with him if she needed a special arrangement.  (Franklin Decl. Ex. 6 at 5; Dussault Decl. Ex. 1 at 104.)  The review also noted that Franklin had problems with arriving to work on time and taking longer than expected lunches.  *Id.*  Franklin testified that she was not late in the mornings, but that she sometimes forgot to log on the phone system as required at the start of her shift.  (Dussault Decl. Ex. 1 at 27-28.)

In August 2006, Simmons wrote a formal final warning to Franklin.  (Dussault Decl. Ex. 1 at 107; Franklin Decl. Ex. 9.)  The warning listed several issues, including nineteen unplanned absences or partial days worked over the previous seven months, ten incidents of tardiness over the same period, eight instances of failing to log on or off her computer, and overstating work experience on her application for a management position at Nike.  *Id.*  The warning also indicated that Franklin was defensive when Simmons raised issues with her and did not accept responsibility.  *Id.*

Franklin responded to the warning in a letter.  Her letter explained that she actually had only four instances of unplanned paid time off, that she had documented only four days when she was tardy and that she had not misrepresented her management experience.  (Franklin Decl. Ex. 10 at 1-2.)  Franklin's letter made no allegation that Simmons' actions were based on her gender or race.  *Id.*

FINDINGS AND RECOMMENDATION – PAGE 6

Franklin testified that, while she was under Simmons' supervision, she took steps to address racial and gender discrimination, but does not indicate when she took those steps. Simmons used the term bitches to refer to women supervisors during group meetings and, on one occasion referred to a woman manager as a c---. (Franklin Decl. at 2; Dussault Decl. Ex. 1 at 21-22.) Franklin testified that she told Simmons that she found that word offensive but did not indicate when this interaction occurred. *Id.* In addition, Franklin testified that she asked Simmons if their conflict was "a black thing" and he said it was not. (Pederson Decl. Ex. 1 at 6.) Franklin further testified that she could accept Simmons' response but also testified that she later told human resources about that conversation. *Id.* at 6, 15. Franklin's declaration states that, at some point in 2006, she approached human resources regarding her suspicion that Simmons' actions were based on her gender and/or race. (Franklin Decl. at 3.) It further states that, the next day, Simmons confronted her relating to her concerns over racial discrimination and "vehemently challenged" her. *Id.* The human resources manager testified that he had three meetings with Franklin and Simmons trying to work out an agreement for them. (Pederson Decl. Ex. 2 at 3.)

Franklin's testimony conflicts in some areas. Franklin's deposition testimony describes most of the preceding incidents as the basis for her belief that Simmons treated her less favorably, but does not refer to the confrontation with Simmons where he challenged her, which she described in her affidavit. *Id.* at 6-7. In addition, Franklin testified that Simmons retaliated against her for reporting that co-workers made mistakes or did not follow policy and for telling Simmons' supervisor that Simmons told employees how to manipulate their time cards. *Id.* at 6, 10, 14. Franklin further testified during her deposition that she did not know why Simmons had treated her differently and that she had shared all of the facts that supported her retaliation claim.

FINDINGS AND RECOMMENDATION – PAGE 7

*Id.* at 7, 24.

Simmons resigned from Nike in September 2006.  (Dussault Decl. Ex. 1 at 35.)  Although Franklin had a new supervisor as a result of Simmons' departure, she did not interact with that supervisor because she was on leave from October 2006 until early January 2007.  *Id.* at 33, 35.

### C.    First EEOC Complaint

Franklin filed an EEOC complaint on December 4, 2006, charging gender discrimination and retaliation and identifying the earliest date of discrimination as February 1, 2006 and the latest as August 31, 2006.[1]  (Dussault Decl. Ex. 1 at 120-121.)  She had earlier contacted the EEOC in February 2006.  *Id.* at 42.  Franklin's complaint charged that she was treated differently from other employees with regard to attendance issues, that she received a final warning and a performance rating of "inconsistent" and that human resources did not take corrective measures when she brought the matter to its attention.  *Id.* at 121.

### D.    Employment Record With Supervisor Reynolds

In January 2007, Sonya Reynolds, an African-American woman, became Franklin's immediate supervisor.  (Reynolds Decl. at 1; Pedersen Decl. Ex. 1 at 16-17.)  Reynolds was unaware of Franklin's previous performance issues and had rapport with Franklin initially.  (Reynolds Decl. at 1.)  She encouraged Franklin to seek leadership positions.  (Franklin Decl. at 5.)

---

1    Although Franklin's amended complaint alleges that she filed an EEOC complaint in August 2006 (Am. Compl., # 36, at 3), she has not submitted any evidence regarding that allegation. Nike, however, submitted a letter from the Oregon Bureau of Labor and Industries that states Franklin filed her EEOC complaint on December 4, 2006.  (Dussault Decl. Ex. 1 at 120.) Franklin testified that the December 2006 could be the correct date for when the EEOC received her complaint.  (Pederson Decl. Ex. 1 at 25.)  Nike's response to the EEOC complaint is dated April 2006, but the 2006 date appears to be a typo because the exhibit list includes documents from July and August 2006.  (Franklin Decl. Ex. 8.)

FINDINGS AND RECOMMENDATION – PAGE 8

Reynolds had several issues with Franklin over the ensuing months, however, including Franklin's failure to communicate intended absences, inability to take feedback well, refusal to share knowledge with co-workers, personal calls and an incident when Franklin gave a tour of the Nike campus after Reynolds told her not to do so.  (Reynolds Decl., at 1-2.)  Reynolds determined that Franklin's performance merited an "inconsistent" rating on her annual performance evaluation.  *Id.* at 2.  Reynolds discussed Franklin's performance with an employee relations manager and then learned of Franklin's previous performance problems.  *Id.*  Reynolds decided to terminate and issued a termination letter dated July 11, 2007 explaining her decision. (Franklin Decl. Ex. 11.)

Franklin disputes the accuracy of Reynold's description of several incidents in the termination letter.  (Franklin Decl. at 6-7, Ex. 11, 13, 15; Dussault Decl., Ex. 1 at 36.)  Franklin, however, testified that she did not know why Reynolds included those issues in her termination letter and that she did not think Reynolds harassed her or treated her unfairly.  (Dussault Decl. Ex. 1 at 35, 39-40.)  Rather, Franklin believed that Reynolds was incompetent and misinformed. *Id.*

### E.    Second EEOC Complaint

Following her termination in July 2007, Franklin filed a second EEOC complaint in January 2008, charging discrimination based on race and retaliation.  (Dussault Decl. Ex. 1 at 43, 123.)  As noted above, Franklin testified that only Simmons and Latch engaged in racial discrimination.  (Dussault Decl. Ex. 1 at 42; Pederson Decl. Ex. 1. at 22.)  Franklin, however, also testified that after she realized that the other people in her group, including women, were not held to the same standards that she was, she concluded that racial discrimination, instead of gender discrimination, was at work.  *Id.* at 43.

FINDINGS AND RECOMMENDATION – PAGE 9

### III.     Franklin's Bankruptcy Petition

Franklin filed for bankruptcy in September 2006.  (Dussault Decl. Ex. 1 at 47, 125.)
Franklin did not list her potential claim against Nike in the section that required her to "list all
suits and administrative proceedings to which the debtor is or was a party within one year
immediately preceding the filing of this bankruptcy case."  *Id.* at 48, 152.  She obtained a
bankruptcy discharge on December 13, 2006.  *Id.* at 27, 161.

### IV.     Franklin's Allegations

Franklin's complaint sets forth three claims for Relief.  The First Claim for Relief alleges
race discrimination leading to both a hostile work environment and disparate treatment.  The
Second Claim for Relief alleges gender discrimination leading to both a hostile work
environment and disparate treatment.  The Third Claim for Relief alleges retaliation for
Franklin's opposition to a racially hostile work environment.  Each claim for relief asserts that
the disparate treatment or retaliation manifested itself in actions that subjected Franklin to greater
scrutiny with regard to performance evaluations, discipline, access to leave, training,
advancement, compensation, enforcement of company policies and termination.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure
materials on file, and any affidavits show that there is no genuine issue as to any material fact
and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary
judgment is not proper if material factual issues exist for trial.  *See, e.g., Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (1986).  The court cannot weigh the evidence or determine the truth and must
construe the evidence in the light most favorable to the nonmoving party.  *Playboy Enters., Inc.
v. Welles,* 279 F.3d 796, 800 (9th Cir. 2002)  An issue of fact is genuine "if the evidence is such

FINDINGS AND RECOMMENDATION – PAGE 10

that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air. Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citation omitted).

## ANALYSIS

### I.    Judicial Estoppel

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (citations omitted).  Courts consider whether to apply the doctrine based on whether the party to be estopped takes a position that is "clearly inconsistent" with a prior position, succeeded in persuading a court to accept the prior position, and would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *New Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001).  Courts may additionally consider whether the incompatible positions are based on inadvertence or mistake.  *In re Corey*, 892 F.2d 829, 836 (9th Cir. 1989).

In the bankruptcy context, "a party is judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements." *Hamilton*, 270 F.3d at 783 (citation omitted).  Courts impose judicial estoppel "when the debtor has knowledge of enough facts to know that a potential cause of action exists during the pendency of the bankruptcy, but fails to amend his schedules or disclosure statements to identify the cause of action as a contingent asset." *Id.* at 784.  Courts reason that "the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets." *Id*. at 785 (citation omitted).

Under the analysis laid out in *Hamilton*, judicial estoppel applies to Franklin's

FINDINGS AND RECOMMENDATION – PAGE 11

discrimination claims to the extent that they rely on adverse employment actions and discriminatory behavior that preceded her discharge of debts in bankruptcy. Franklin's bankruptcy proceeding position that she did not have any pending claims is inconsistent with her current position that Latch and Simmons subjected her to disparate treatment and a hostile work environment. The bankruptcy court accepted her position, and that acceptance creates the perception that Franklin either misled that court or seeks to mislead this court. Moreover, Franklin would derive an unfair advantage if not estopped because her pre-termination discrimination claims that might have been available to her creditors are now unavailable to them.

Franklin, however, may pursue her claims to the extent that they rely on her termination. When she filed for bankruptcy in December 2006, Franklin could not know that she would be terminated in July 2007. Thus, Franklin's claims based on her termination do not play "fast and loose" with the judicial system. *See In re Corey,* 892 F.2d at 837. However, I find that, because Franklin testified that only Simmons and Latch engaged in discriminatory behavior, judicial estoppel precludes her hostile work environment claims. The court should therefore grant summary judgment on the hostile work environment claims contained in Franklin's First and Second Claims for Relief.[2]

---

2  Even if Simmons was not judicially estopped from asserting her hostile work environment claims, she fails to set forth sufficient evidence to survive summary judgment on those claims. A plaintiff seeking to prevail on a hostile workplace claim must show: (1) that she was "subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); see also *Manatt v. Bank of Am.*, 339 F.3d 792, 799 (9th Cir. 2003) (co-workers' racist jokes and a few occasions of racially insensitive humor directed at the plaintiff

II.    **Timeliness of the Racial Discrimination Claim**

Title VII requires exhaustion of administrative remedies prior to filing suit in federal court.  *See* 42 U.S.C. § 2000e-5(e)(1).  A person seeking relief under Title VII must file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred" or, if the person initially instituted proceedings with the state or local administrative agency, within 300 days of the alleged unlawful employment practice.  *Id* .

For charges that involve a discrete retaliatory or discriminatory act, the 180 days starts to run on the day the act happened.  *AMTRAK v. Morgan*, 536 U.S. 101, 110 (2002).  Discrete discriminatory acts such as employee discipline, termination, failure to promote, denial of transfer, or refusal to hire are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  *Id.* at 113.

Here, although Franklin testified that Latch and Simmons' actions led to her racial discrimination claim, her December 2007 EEOC racial discrimination charge is more than 180 days after Latch stopped serving as her supervisor in March 2004 and Simmons' September 2006 departure from Nike.  Moreover, although Reynolds served as Franklin's supervisor during the 180 days before Franklin's EEOC charge of racial discrimination, Franklin, testified that she did not think Reynolds harassed her or treated her unfairly.  As a result, the court should grant Nike's motion for summary judgment on Franklin's First Claim for Relief for racially motivated disparate treatment.

---

were insufficient to establish a hostile environment); *Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1111 (9th Cir. 2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions).  Here, although the noose display and Simmons' use of offensive language when referring to women supervisors shows a troubling lack of sensitivity, Franklin has not established the conduct was so severe or pervasive that it created an abusive working environment.

FINDINGS AND RECOMMENDATION – PAGE 13

**III.    Merits of the Gender-Based Disparate Treatment Claim**

A plaintiff in a Title VII case must establish a prima facie case of discrimination.

*Vasquez*, 349 F.3d at 640.  A plaintiff seeking to establish a prima facie case of discrimination

must offer evidence that gives rise to an inference of unlawful discrimination, either through the

framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial

evidence of discriminatory intent.  *Id.* (citing *McDonnel Douglas*, 411 U.S. 792 (1973)).  Under

*McDonnell Douglas*, a court presumes unlawful discrimination if the plaintiff can show that "(1)

she belongs to a protected class, (2) she was performing according to her employer's legitimate

expectations, (3) she suffered an adverse employment action, and (4) other employees with

qualifications similar to her own were treated more favorably."  *Id.* at 640 n.5. (citations

omitted).  If the plaintiff succeeds in establishing a prima facie case, then the burden shifts to the

defendant to articulate a legitimate, nondiscriminatory reason for the allegedly discriminatory

conduct.  *Id.* at 640.

Courts in some cases have presumed, without deciding, that the plaintiff has established a

prima facie case and proceed to the latter part of the analysis.  *Villiarimo,* 281 F.3d at 1062 n.8

(assuming without deciding that plaintiff made out a prima facie case of discrimination but

affirming grant of summary judgment against plaintiff because she did not demonstrate that the

employer's non-discriminatory explanations for her termination were pretextual).  That approach

seems appropriate here.

**A.    Legitimate, Non-discriminatory Reasons for Termination**

Here, assuming without deciding, that plaintiff has established a prima facie case, Nike

has offered a legitimate, non-discriminatory reasons for its actions.  Franklin testified that

Simmons' behavior is the basis for her gender discrimination and that Reynolds relied on

FINDINGS AND RECOMMENDATION – PAGE 14

Simmons' evaluations and warnings in her termination decision.  Simmons stated specific, non-discriminatory reasons for his decisions to give Franklin a "record of coaching," to rate her performance as inconsistent in her 2005 and 2006 employment reviews, and to issue a final warning to Franklin.  Reynolds' termination letter  to Franklin cited issues raised by Simmons and additional non-discriminatory reasons to end Franklin's employment with Nike.

### B.    Pretext

"Once the defendant produces evidence of a legitimate non-discriminatory reason to counter the plaintiff's demonstration of a prima facie case, the *McDonnell Douglas* presumption of discrimination drops out of the picture." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004) (citation omitted).  The plaintiff then bears the burden to demonstrate that the employer's reason is a pretext for discrimination. *Vasquez*, 349 F.3d at 640.  Although the plaintiff's burden at the summary judgment stage "is not great," the plaintiff "cannot rely on generalizations." *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995).  Rather, "the plaintiff must show that the articulated reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Nicholson v. Hyannis Air Serv.*, 580 F.3d 1116 (9th Cir. 2009).  An explanation that the employer relied on inaccurate information is insufficient because "courts only require that an employer honestly believed its reason for its actions, even if its reason is . . . baseless." *Villiarimo*, 281 F.3d at 1063.

Actions by prior supervisors who did not make the ultimate adverse employment decision may nonetheless serve as evidence of discrimination. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1114 (9th Cir. 2003) (finding that although human resources and upper management made the final termination decision, that did not cut off causation when the evidence on

FINDINGS AND RECOMMENDATION – PAGE 15

summary judgment showed they merely relied on the supervisor's pretextual list of alleged

violations); *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001)

(holding that sufficient facts supported the jury verdict that discriminatory animus motivated the

employer where human resources' decision to layoff plaintiff relied on supervisor's pretextual

employment evaluations without further inquiry); *see also Poland v. Chertoff*, 494 F.3d 1174,

1182 (9th Cir. 2007) ("[E]ven if the biased subordinate was not the principal decisionmaker, the

biased subordinate's retaliatory motive will be imputed to the employer if the subordinate

influenced, affected, or was involved in the adverse employment decision.")  Thus, I conclude

that, although Franklin bases her gender discrimination claim on Simmons' actions, the fact that

Reynolds made the ultimate decision to terminate Franklin does not foreclose Franklin's claim.

Franklin, however, has not offered evidence to show that Nike's proffered explanation for

her termination is unworthy of credence.  She admits that she committed many of the infractions

listed in her disciplinary history and disputes several others on the ground that either Simmons or

Reynolds was merely misinformed.  Moreover, she has offered no evidence that Simmons

overlooked similar rules violations committed by other employees.  *See Vasquez,* 349 F.3d at 642

("[I]ndividuals are similarly situated when they have similar jobs and display similar conduct.").

Thus, Franklin must show that a discriminatory reason motivated Nike to terminate her

employment.

Racist or sexist comments may suggest that the employer considered impermissible

factors and thus are relevant to a disparate treatment claim.  *Merrick v. Farmers Ins. Group*, 892

F.2d 1434, 1438 (9th Cir. 1990); *see also EEOC v. Boeing Co.*, 577 F.3d 1044 (9th Cir. 2009)

(supervisor's derogatory remarks about women, combined with his course of behavior, including

refusing her request for transfer and decision to transfer a man instead, were sufficient to raise a

FINDINGS AND RECOMMENDATION – PAGE 16

question of fact regarding discriminatory animus); *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) (supervisor's repeated sexist comments, participation in the hiring decision and statement that "he was going to hire a guy" were sufficient to establish discriminatory animus); *Schnidrig v. Columbia Mach.*, 80 F.3d 1406, 1411 (9th Cir. 1996) (repeated comments that the board of directors sought someone young to fill a position and meeting notes indicating that board imposed an age limit were sufficient evidence that employer unlawfully considered plaintiff's age).

On the other hand, "stray" remarks are insufficient to establish discrimination. *Merrick*, 892 F.2d at 1434 (supervisor's statement that he selected a candidate for a position because he was a "bright, intelligent, knowledgeable young man" was merely a stray remark); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (supervisor's comment that "we don't necessarily like grey hair" was insufficient to establish pretext where it was unconnected to the adverse employment decision); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996) (supervisor's comment that he wanted to get rid of "old timers" was insufficient to establish pretext because it was not tied to the decision lay off the plaintiff).

Here, although Franklin argues that Simmons' remarks suffice to establish discriminatory animus, I find that argument unpersuasive. Simmons' use of derogatory terms for women was not directed to Franklin. In addition, no evidence suggests that Simmons' use of those terms related to his adverse employment actions. Therefore, the court should grant summary judgment on Franklin's Second Claim for Relief to the extent that it asserts a claim for disparate treatment based on gender.

## IV.    Retaliation Claim

### A.    Contradictions Between Affidavit and Deposition Testimony

FINDINGS AND RECOMMENDATION – PAGE 17

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991). "[E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence," however. *Id.* Rather, the court "must make a factual determination that the contradiction was actually a sham." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (citation omitted). In addition, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* Thus, "minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.*

Here, Nike takes issue with statements in Franklin's affidavit as they apply to her retaliation claim. First, Franklin testified that she did not know why Simmons treated her differently but she believed he retaliated against her for reporting co-workers' mistakes and Simmons' timecard policy. Second, Simmons testified regarding the buzzard incident and the interaction over Simmons' use of derogatory words only in relation to her disparate treatment claim but now relies on them in support of her retaliation claim. Third, Franklin's declaration provides a specific time frame for her conversation with Simmons regarding the noose display although she stated in her deposition that it took place after she returned "from vacation or whatever." Finally, Franklin did not testify that Simmons confronted her after she reported that she thought his actions were racially motivated but her declaration states he "vehemently challenged" her. Franklin also testified at her deposition that she had shared all of the facts that supported her retaliation claim.

With the exception of the description of the confrontation with Simmons in Franklin's

FINDINGS AND RECOMMENDATION – PAGE 18

affidavit, I find no reason to disregard Franklin's testimony.  The fact that Franklin testified as to a number of possible reasons for Simmons' actions does not directly contradict her affidavit.  In addition, Franklin's statement in her affidavit that the noose display incident occurred when she returned from maternity leave in March does not directly contradict her deposition testimony that the conversation took place after she returned from "vacation or whatever."  Franklin's statement concerning the confrontation with Simmons where he "vehemently challenged" her is more troubling, however.  That statement conflicts with her deposition testimony that she had recounted all the facts related to her retaliation claim.  Moreover, the facts suggest that her affidavit is a sham.  During her deposition, Franklin could recall the conversations with Simmons concerning the noose display and his derogatory remarks towards women but somehow managed to forget an incident where he vehemently challenged her.  Franklin has offered no explanation for why she did not recount that incident during her deposition.  I therefore disregard that confrontation in my analysis of Franklin's retaliation claim.

### B.    Merits of the Retaliation Claim

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) she engaged in an activity protected under Title VII; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action.  *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004).  The employer's awareness of the protected activity is important in establishing a causal link, as is the proximity in time between the protected action and the allegedly retaliatory employment decision.  *Id.* at 812.

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Stegall v.*

FINDINGS AND RECOMMENDATION – PAGE 19

*Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003) (citation omitted).  If the defendants

articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason

was a pretext for a discriminatory motive.  *Brown v. City of Tucson*, 336 F.3d 1181, 1187-1188

(9th Cir. 2003) (fact that employer investigated the plaintiff shortly after she complained of

discrimination was insufficient to establish pretext where evidence showed that the employer

decided to investigate only after learning of her rule violation and plaintiff failed to show that the

employer overlooked similar rules violations by other employees); *see also Surrell v. Cal. Water

Serv.*, 518 F.3d 1097 (9th Cir. 2008) (plaintiff did not raise a triable issue regarding whether her

employer's decision to perform a drug test was pretextual because she admitted that she appeared

impaired and was taking drugs); *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1036

(9th Cir. 2006) (plaintiff did not produce evidence warranting trial on his retaliation claim where

the evidence showed he refused perform certain job duties and the employer articulated that

failure as the basis for his termination).

Here, assuming that Franklin can establish a prima facie case, her retaliation claim faces

challenges because, as noted above, Nike has offered legitimate reasons for her termination and

she has not offered evidence that Nike's proffered explanation for her termination is unworthy of

credence.  Thus, Franklin must offer sufficient evidence that would allow a reasonable juror to

conclude that Nike's decision to terminate her employment was retaliatory.

Franklin's evidence is insufficient to create a question of fact regarding Nike's motive for

terminating her employment because, like the situation in *Brown*, Nike's actions coincide with

Franklin's rule violations and Franklin has no evidence that Nike treated other employee's similar

rules violations more leniently.  Franklin complained about Simmons' use of derogatory language

for women at some point and complained about the noose display in March 2005.  She received

FINDINGS AND RECOMMENDATION – PAGE 20

her first poor employment evaluation from Simmons in July 2005, approximately four months after the noose incident.  Nike, however, did not discipline Franklin until several months later, in November 2005, and Franklin at any rate admitted that the disciplinary action was accurate regarding her tardiness and failure to report to work.  Similarly, although at some point, Franklin told both Simmons and human resources that she thought it was a "black thing" and she and Simmons together met with human resources in 2006, her final warning in 2006 took place after she was tardy to work.  That tardiness occurred shortly after Simmons sent an email to the entire team concerning timeliness and after several indications that her tardiness was an issue. Moreover, Franklin admitted that she was, in fact, tardy and failed to inform Simmons as required.  Thus, like the plaintiff in *Brown*, Franklin has not offered sufficient evidence such that a reasonable juror could conclude that Simmons' actions were retaliatory because those actions coincided with Franklin's admitted rules violations and nothing suggests other employees escaped punishment for similar violations.  The court should therefore grant Nike's motion for summary judgment on Franklin's Third Claim for Relief.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (#40) should be granted and judgment should be entered accordingly.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

FINDINGS AND RECOMMENDATION – PAGE 21

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due November 30, 2009.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.  If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.


Dated this 13th day of November, 2009.


 /s/ Paul Papak                            
Honorable Paul Papak
United States Magistrate Judge

FINDINGS AND RECOMMENDATION – PAGE 22